IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RICHARD E. SLATER, IDOC # B78598,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | CIVIL NO. 11-752-GPM |
| | ) | |
| **KATHIE BUTLER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Plaintiff Richard E. Slater, a prisoner in the custody of the Illinois Department of Corrections ("IDOC") who currently is incarcerated in the closed maximum security prison at the Tamms Correctional Center ("Tamms C-Max""), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights by persons acting under color of state law. This case now is before the Court for screening pursuant to 28 U.S.C. § 1915A, which provides, in relevant part:

> (a) Screening. – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) Grounds for dismissal. – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
> (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted[.]

28 U.S.C. § 1915A. An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint fails to state a claim upon which relief may be granted if it does not plead "enough facts to state a claim to relief that is plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Though a court must accept a plaintiff's factual allegations as true, "some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Also, courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id*. The factual allegations of a pro se complaint must be liberally construed. *See Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir. 2006) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

The claims asserted by Slater in his pro se complaint amount to a laundry list of alleged denials of care by medical staff at Tamms C-Max, chiefly in connection with Slater's diabetes. Slater alleges that on July 25, 2008, Defendant Terry Caliper, a registered nurse ("RN") and health care unit ("HCU") administrator at Tamms C-Max, denied Slater treatment for numbness in Slater's right hand. On August 19, 2008, Slater alleges, Defendant Marilyn Melton, an RN at Tamms C-Max, denied Slater medication and treatment for chest pain and an irregular heartbeat. On December 12, 2008, Defendant Brad McCarthy, a licensed practical nurse ("LPN") at Tamms C-Max, allegedly denied Slater insulin; Slater claims that McCarthy's conduct was in retaliation for Slater having called McCarthy a "fat ass liar." Doc. 2 at 4. On August 30, 2008, Defendant Rhonna Medlin, an RN at Tamms C-Max, allegedly denied Slater his medicine because she was "in a rush." *Id*. Slater alleges also that Medlin denied him his medication on January 26, 2009, and January 28, 2009. On May 27, 2009, Defendant Krissy Watson, an LPN

at Tamms C-Max, allegedly denied Slater treatment for heartburn.  On June 12, 2009, Defendant Stacey Williamson, an RN and director of nursing at Tamms C-Max, allegedly denied Slater treatment for a problem Slater was suffering from involving "urine dripping," apparently due to a prostate condition.  On June 12, 2009, Defendant Kathie Butler, an LPN at Tamms C-Max, allegedly denied Slater an electrocardiogram ("EKG") test, supposedly on the orders of Defendant Dr. Marvin Powers, a physician and medical director at Tamms C-Max, after Slater experienced irregularity in his heartbeat.  On August 9, 2009, Powers allegedly denied Slater treatment for pain in Slater's left knee and right foot caused by Slater's diabetes.  On September 19, 2009, Defendant Connie Kerr, an LPN at Tamms C-Max, allegedly declined to draw Slater's blood for the purpose of testing Slater's blood sugar level.  Finally, Slater alleges that he was wrongfully denied an Accu-Check test of his blood sugar level by:  Watson on April 1, 2009, September 25, 2009, and November 8, 2009; Defendant Shelby Dunn, an RN at Tamms C-Max, on April 1, 2009; Kerr on March 31, 2009; and Defendant Laura Qualls, an RN at Tamms C-Max, on January 25, 2010.  Slater alleges violation of his Eighth Amendment rights.[1]

---

1. This perhaps is the place to note that Slater's claims in this case originally were brought as part of an earlier-filed case, *Slater v. Watkins*, Civil No. 10-973-GPM (S.D. Ill. filed Dec. 2, 2010), which included allegations of use of excessive force against Slater on December 5, 2008, by James Watkins and George Johnson, who are guards at Tamms C-Max, and a failure to intervene to prevent the alleged assault by Billy Vaughn, an officer at Tamms C-Max.  Slater claimed also that Powers denied Slater medical care for injuries Slater allegedly sustained as a result of the assault. Having determined that Slater's claims against Watkins, Johnson, Vaughn, and Powers in connection with the alleged assault were misjoined with Slater's other claims against Powers, McCarthy, Melton, Medlin, Williamson, Caliper, Watson, Kerr, Dunn, Butler, and Qualls, the Court, after allowing Slater a reasonable period in which to take a voluntary dismissal of his claims in Civil No. 10-973 that were unrelated to the December 5 incident, severed those claims from Civil No. 10-973 and opened them in this case.

The standard governing claims for deliberate indifference to a prisoner's serious medical needs is well established. The Eighth Amendment "imposes upon prison officials the duty to 'provide humane conditions of confinement,' including the obligation to provide medical care to those whom [they have] incarcerated[.]" *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Correspondingly, "deliberate indifference to serious medical needs of prisoners" on the part of prison officials "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). A prisoner raising an Eighth Amendment claim against a prison official for deliberate indifference to the prisoner's serious medical needs must satisfy two requirements. The first requirement compels the prisoner to satisfy an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious[.]'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Thus, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The second requirement demands that the prisoner satisfy a subjective standard: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that amounts to "'deliberate indifference' to inmate health or safety[.]" *Id*. (quoting *Wilson*, 501 U.S. at 297). *See also McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991). "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Zentmyer v. Kendall County, Ill*., 220 F.3d 805, 810 (7th Cir. 2000)) (internal citation omitted).

In the Seventh Circuit, "'deliberate indifference' . . . is merely a synonym for intentional or criminally reckless conduct," that is to say, "conduct 'that reflects complete indifference to risk – when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death.'" *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991) (quoting *Archie v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988)). *See also Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)) ("Deliberate indifference 'is more than negligence and approaches intentional wrongdoing' . . . . [D]eliberate indifference is 'essentially a criminal recklessness standard, that is, ignoring a known risk.'"); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)) (a prison official's conduct "is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, 'the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.'") (brackets and internal citation omitted). Moreover, "[m]ere negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985)). Also, to find deliberate indifference, there must be "substantial indifference in the individual case, indicating more than mere negligent or isolated occurrences of neglect." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Thus, "[a] finding that a defendant's neglect of a prisoner's condition was an isolated occurrence, . . . or an isolated exception . . . to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." *Id*. (quotation omitted).

Concerning Slater's claim against Caliper for alleged failure to treat numbness in Slater's right hand, it appears from the documentation attached to Slater's complaint that Caliper scheduled Slater to be examined by Powers on August 18, 2008, for complaints of numbness in Slater's right hand. *See* Doc. 2-2 at 16. Powers examined Slater on August 18, 2008, for pain in Slater's right hand and again saw Slater on October 10, 2008, at which time Slater mentioned no problem with his right hand. *See id*. at 18. It appears that Slater's complaint against Caliper is that Slater was charged a $2.00 co-pay for both his August 18 examination and his October 10 examination. *See id*. at 16-17. Concerning Slater's claim against Melton, it appears from the documentation attached to Slater's complaint that on August 19, 2008, Melton attempted to give Slater his scheduled medication, but Slater refused to answer Melton's questions as to whether Slater wanted his medication, behavior which Melton interpreted as a refusal of the medication. *See* Doc. 2-3 at 50-51. With respect to Slater's claim against McCarthy, it appears that under Tamms C-Max policy, "any display of inappropriate behavior [by a prisoner] . . . will constitute a refusal of the [medical] service being provided and the service may be terminated." Doc. 2-2 at 6. Slater's conduct in calling McCarthy a "fatass" was deemed inappropriate behavior warranting a denial of medical services to Slater by McCarthy. *See id*. With respect to Slater's claims against Medlin for allegedly denying Slater his medication on August 30, 2008, January 26, 2009, and January 28, 2009, it appears from the documentation attached to Slater's complaint that on August 30, 2008, Slater refused his insulin shot because Medlin would not inject Slater in his abdomen; apparently Slater already had received twelve insulin injections in the abdomen, and Medlin believed it was appropriate to rotate the injection site. *See* Doc. 2-3 at 44-45. On January 26, 2009, Slater claims that he was addressed in a racist and threatening manner by

Medlin and that Medlin refused Slater his insulin; Medlin states that Slater refused his insulin because Medlin, consistent with procedure at Tamms C-Max, prepared Slater's insulin shot in the medication room at the HCU at Tamms C-Max and refused to prepare the shot in Slater's presence as he demanded. *See id*. at 40-42. On January 28, 2009, Slater claims that Medlin addressed him in a threatening and racist manner. *See id*. at 36-38.

With respect to Slater's claim against Watson, it appears from the documentation attached to Slater's complaint that on May 27, 2009, Watson, having been notified of Slater's complaints of heartburn and chest pains, prepared the treatment room at the HCU while another nurse visited Slater's cell to assess his condition. *See* Doc. 2-3 at 30. The nurse who visited Slater's cell found that Slater's vital signs were normal; a follow-up visit to Slater's cell about two hours later also disclosed no medical emergency. *See id*. With respect to Slater's claim against Williamson, it appears from the documentation attached to Slater's complaint that Slater was examined by Williamson for his "urine dripping" on June 12, 2009, and by Powers for the same condition on June 25, 2009; following his examination by Powers, Slater reported no further urinary tract problems. *See id*. at 7. With respect to Slater's claim against Butler and Powers for refusing to give him an EKG test, the documentation attached to Slater's complaint shows that on October 18, 2009, Slater filed a grievance stating that unnamed medical staff at Tamms C-Max had refused to give Slater an EKG test to determine whether chest pain, irregular heartbeat, and numbness in his left arm and left side that Slater was experiencing were the products of a heart condition. *See id*. at 53-54. Nigel Vinyard, a HCU administrator at Tamms C-Max, responded to Slater's grievance by saying that "Mr. Slater has 24-hour a day access to health care and is scheduled in the cardiovascular clinic on a regular basis for evaluation of his medical condition. He is receiving

adequate medical care, however, he should ask for medical attention, when he experiences an episode as described in this grievance." *Id*. at 53. The grievance counselor added, "Offender Slater does not mention any specific incident in which he was denied medical treatment for chest pain. However, he [Slater] may be reminded that it is the medical staff who determine the necessity of medical tests, not himself." *Id*.

With respect to Slater's claim against Powers for allegedly refusing to treat Slater's diabetes, it appears from a grievance filed by Slater on August 19, 2009, that is attached to Slater's complaint that Powers examined Slater on August 11, 2009, and prescribed a pain reliever for pain in Slater's left knee and right foot caused by Slater's diabetes. *See* Doc. 2-2 at 41. However, Slater contends that he was given inadequate treatment because he did not receive an x-ray or "proper shoes" and therefore should not have been charged a $2.00 co-pay for the examination. *See id*. at 43. With respect to Slater's claim against Kerr, it appears from the documentation attached to Slater's complaint that the gist of Slater's complaint is that he was improperly charged a $2.00 co-pay for his treatment by Kerr on September 19, 2009; however, the record reflects also that the co-pay was refunded to Slater's prison trust fund account. *See id*. at 31. Finally, with respect to Slater's claims against Watson, Dunn, Kerr, and Qualls, it appears that all of these claims are based on the fact that these Defendants refused to give Slater an Accu-Check test of his blood sugar level without charging Slater a $2.00 co-pay.[2] Apparently, the policy of the HCU at Tamms C-Max is to schedule regular visits with prisoners suffering from chronic illnesses, for which no co-pay is charged. On the other hand, if a diabetic prisoner requests an Accu-Check test, and does not appear to medical personnel

---

2.   Accu-Check, it perhaps should be noted, is "the brand name of a medical meter used to determine a patient's blood sugar level." *Fletcher v. Deathridge*, No. 07-1231, 2009 WL 2566971, at *1 (C.D. Ill. Aug. 17, 2009).

at Tamms C-Max to be in hypoglemic shock or some other emergency condition, the prisoner is charged a $2 co-pay. Slater's position is that, as a diabetic, he should be able to receive Accu-Check tests whenever he wants them, at no charge, regardless of whether he is displaying signs or symptoms indicating the necessity of such a test. According to Williamson, "Mr. Slater asks for frequent checks of his blood sugar. As he is a diabetic, nursing staff are expected to assess his signs and symptoms to determine if an accu-check (blood sugar check) may be needed. If the nurse deems Slater to be in need of an accu-check, one is completed without the assessment of the $2 co-payment fee on an 'emergency' basis." Doc. 2-3 at 17. "However," Williamson continues, "Mr. Slater often requests an accu-check for no obvious reason. If the nurse does not observe any signs or symptoms requiring an accu-check, Mr. Slater is charged the $2 co-payment fee. He is never denied the service. He chooses not to have it done so he doesn't have to pay the fee." *Id*. Williamson added that Slater is never charged a co-pay "for treatment of his chronic illness at the regularly scheduled chronic illness clinic visit." *Id*.

With respect to Slater's claim against McCarthy for denying Slater medical service due to Slater's abusive and disrespectful conduct, McCarthy's behavior plainly does not amount to deliberate indifference. *See Cherry v. Berge*, No. 02-C-544-C, 02-C-394-C, 2003 WL 23095796, at *6 (W.D. Wis. June 26, 2003) ("[A] prison official does not act 'wantonly' when he denies an inmate medication because of his misconduct and not out of desire to cause harm.").[3] Similarly,

---

3. To the extent Slater may be claiming retaliation by McCarthy in violation of the First Amendment, calling a prison officer a "fatass" is insolence, not constitutionally-protected speech. *See Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010) (quoting *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008)) ("Insubordinate remarks that are 'inconsistent with [an] inmate's status as a prisoner or with the legitimate penological objectives of the corrections system' are not protected" by the First Amendment and therefore cannot form the basis for a claim of unlawful retaliation.").

Medlin's refusal to depart from HCU protocols in preparing Slater's medication in order to satisfy Slater's paranoid whims obviously does not rise to the level of an Eighth Amendment violation. As for Slater's allegations that Medlin addressed him in a threatening and racist manner, if true, this is of no constitutional significance. *See Antoine v. Uchtman*, 275 Fed. Appx. 539, 541 (7th Cir. 2008) (holding that racist and threatening statements by state prison guards in retaliation for a prisoner's filing of grievances did not violate the prisoner's constitutional right to speak and to petition the government for redress of grievances, and noting that "the Constitution does not compel guards to address prisoners in a civil tone using polite language."); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("Standing alone, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws.") (collecting cases). Likewise, the fact that Butler and Powers allegedly refused to furnish Slater with an EKG test, an x-ray, and special shoes on Slater's demand is not a violation of Slater's Eighth Amendment rights. "[S]ociety does not expect that prisoners will have unqualified access to health care[.]" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Thus, a prisoner "is not entitled to demand specific care" or "the best care possible" and instead, a prisoner "is entitled to reasonable measures to meet a substantial risk of serious harm[.]" *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). In any event, it is not the Court's job to referee disputes between a prisoner and his or her health care providers about the best course of treatment for the prisoner. *See Brownlow v. Chavez*, 871 F. Supp. 1061, 1064 (S.D. Ind. 1994) ("The Eighth Amendment does not guarantee a prisoner's choice of a physician, a mode of treatment or a place of treatment, nor does or could it guarantee a particular outcome or level of comfort in the face of physical maladies.") (citation omitted).

The Court turns finally to the principal issue presented by Slater's complaint, the constitutionality of Tamms C-Max's co-pay policy. In general, "'[c]o-pay' policies under which inmates must bear part of the cost of their treatment are Constitutionally permissible if they do not interfere with timely and effective treatment of serious medical needs." *Jones-Bey v. Cohn*, 115 F. Supp. 2d 936, 940 (N.D. Ind. 2000). *See also Hudgins v. DeBruyn*, 922 F. Supp. 144, 150-52 (S.D. Ind. 1996) (a prisoner co-payment plan does not violate the Eighth Amendment); *Martin v. Debruyn*, 880 F. Supp. 610, 615 (N.D. Ind. 1995) (the Eighth Amendment guarantees only that prisoners receive necessary medical care; it does not guarantee free medical care). Under the Illinois Unified Code of Corrections, 730 ILCS 5/1-1-1 *et seq*.,

> The [IDOC] shall require the committed person receiving medical or dental services on a non-emergency basis to pay a $5 co-payment to the [IDOC] for each visit for medical or dental services. The amount of each co-payment shall be deducted from the committed person's individual account. A committed person who has a chronic illness, as defined by [IDOC] rules and regulations, shall be exempt from the $5 co-payment for treatment of the chronic illness. A committed person shall not be subject to a $5 co-payment for follow-up visits ordered by a physician, who is employed by, or contracts with, the [IDOC]. A committed person who is indigent is exempt from the $5 co-payment and is entitled to receive medical or dental services on the same basis as a committed person who is financially able to afford the co-payment. For the purposes of this Section only, "indigent" means a committed person who has $20 or less in his or her Inmate Trust Fund at the time of such services or for the 30 days prior to such services.

730 ILCS 5/3-6-2(f). Similarly, under IDOC regulations,

> Adult offenders who require non-emergency medical or dental services shall authorize the Department to deduct a $2.00 co-pay from present or future funds in his or her trust fund account prior to each visit. Non-emergency services do not include any follow-up visits determined necessary by a Department physician or HIV (Human Immunodeficiency Virus) testing and related counseling.
> 1) The co-payment shall be paid from the offender's trust fund when the services are delivered.
> 2) Offenders who are without funds at the time services are delivered shall not be denied medical or dental services. Except as indicated in subsection (g)(3), the offender's trust fund account shall be restricted for the amount of co-payment and

> shall be paid upon receipt of future funds.
> 3) Offenders shall be exempt from the co-payment if, at the time services are provided, the offender is indigent. Offenders shall be found indigent if:
> A) At the time service is delivered, the offender's trust fund balance is under $2.00; and
> B) At no time for the 60 days immediately preceding the service or since arrival at the offender's current facility, whichever occurred most recently, has the offender's trust fund contained more than $2.00, regardless of the source of funds.

Ill. Admin. Code tit. 20, § 415.30(g). As the pertinent statutes and regulations make clear, no IDOC prisoner in need of emergency medical care is subject to the co-pay requirement, and no IDOC prisoner can be denied care on the basis of inability to pay the co-pay. As the statutes and regulations also make clear, the authority to make determinations about how and when the co-pay is paid is reposed solely in the IDOC. Powers, McCarthy, Melton, Medlin, Williamson, Caliper, Watson, Kerr, Dunn, Butler, and Qualls are employees of Wexford Health Sources, Inc. ("Wexford"), a private firm that furnishes medical services to prisoners at Tamms C-Max pursuant to a contract between Wexford and the IDOC. A private corporation or its employees acting under color of state law by, as here, participating in the operation of a state prison may be held liable for violations of a prisoner's constitutional rights. *See Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 & n.1 (7th Cir. 2004); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 & n.6 (7th Cir. 2002). However, it is apparent that Powers, McCarthy, Melton, Medlin, Williamson, Caliper, Watson, Kerr, Dunn, Butler, and Qualls, as Wexford employees, have no authority to waive IDOC statutes and regulations governing the co-pay that non-indigent IDOC prisoners must pay for non-emergency medical care. Slater has no constitutional claim against any Defendant in this case based on the co-pay that Slater is required to pay for non-emergency medical care at Tamms C-Max.

To conclude, pursuant to 28 U.S.C. § 1915A, this case is **DISMISSED with prejudice** as frivolous. Slater is advised that the dismissal of this case counts as one of his three allotted "strikes" under 28 U.S.C. § 1915(g). The Clerk of Court is directed to enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

DATED: April 4, 2012

/s/ G. Patrick Murphy
G. PATRICK MURPHY
United States District Judge